SMITH *v.* NEW YORK CENT. & H. R. R. CO.

(*Supreme Court, General Term, Fifth Department.* January 22, 1892.)

RAILROAD COMPANIES—INJURIES TO PERSONS ON TRACK—CONTRIBUTORY NEGLIGENCE.
    In an action against a railroad for personal injuries, it appeared that plaintiff was riding on a locomotive on the B., R. & P. R. R.; that this road ran parallel to defendant's tracks; that at C. street, where plaintiff alighted, defendant's nearest track was only 7½ feet distant from the B., R. & P. track; that from this street a train approaching on defendant's track from the west could be seen two miles away; and that plaintiff knew of the location of the tracks, and the frequency with which defendant's trains passed. When the locomotive stopped at C. street, plaintiff descended from the cab backwards, stepped on defendant's nearest track, and was struck by a train coming from the west. Plaintiff testified that about the moment the locomotive stopped, and before descending, he looked in both directions, and did not see an approaching train. *Held,* that it was proper to nonsuit plaintiff on the ground of contributory negligence in not looking and listening after he descended from the cab.

Exceptions from circuit court, Monroe county.
    Action by John Sebastian Smith against the New York Central & Hudson River Railroad Company for personal injuries. A nonsuit was directed by

the court, and plaintiff moved for a new trial. Ordered to be heard at general term in the first instance. Motion denied.

Argued before DWIGHT, P. J., and MACOMBER and LEWIS, JJ.

*E. L. Adams,* for plaintiff.    *Albert H. Harris,* for defendant.

MACOMBER, J.    This action was brought to recover damages for personal injuries sustained by the plaintiff on March 21, 1889, while attempting to cross the defendant's railroad at Colvin street, in the western part of the city of Rochester. At about 8 o'clock in the evening of that day the plaintiff was struck by a locomotive coming from the west operated by the defendant, at the place named, and was seriously injured. The plaintiff was by occupation a blacksmith, and was, at the time named, in the employ of the Buffalo, Rochester & Pittsburg Railroad, at their shops at Lincoln Park, which is just west of the west boundaries of the city of Rochester. Ordinarily his labors for the day ceased at about 6 o'clock in the afternoon, when he walked to his home on Syke street, about 10 houses from Colvin street, and north of the tracks of this defendant. On the evening in question, having worked overtime, he, with many other laborers, boarded a work-train of the Buffalo, Rochester & Pittsburg Company, most of the men getting into the caboose, but the plaintiff, with two others, got onto the engine, and rode there to Colvin street. This locomotive was backing to the east, being faced to the west on the main track of the railroad, which was parallel with and in close proximity to the defendant's railroad, and was drawing the caboose by a rod attached to it from the pilot. The plaintiff was familiar with the location of the tracks of both railroads, and knew of the frequent, not to say almost constant, passing of trains on the defendant's road at this place. At Colvin street the tracks of the defendant's road are perfectly straight for a distance of 1,850 feet west. There are four main tracks, numbered, respectively, 1, 2, 3, and 4, beginning on the south side. To the east the tracks are straight for 2,000 feet. Parallel to and south of the defendant's tracks are two tracks of the Buffalo, Rochester & Pittsburg Railroad. The northernmost of these tracks, which is the main track, is 7½ feet from the south rail of track No. 1, on the defendant's road. At a distance of 1,850 feet west of Colvin street the defendant's tracks curved slightly to the south, but not so much as to prevent a clear observation of an approaching train for at least two miles. The working train of the Buffalo, Rochester & Pittsburg Company, having started from Lincoln Park, stopped, for the purpose of discharging the laborers, first at Ames street, and then at Colvin street, when the plaintiff alighted from the locomotive on which he was riding, (descending the steps backward towards the defendant's tracks, having in his mouth a pipe, and in one hand a dinner-pail,) swung himself round to the ground, took one or two steps to the north, and was instantly struck by the engine of the St. Louis express, coming from the west, which was running at the rate of about 40 miles an hour.

At the close of the plaintiff's case in chief, a motion was made by the defendant's counsel for a nonsuit, on the ground that the plaintiff had failed to show that he was free from negligence which contributed to the production of the injury. This motion was, for a time, denied; but soon thereafter, and while evidence was being given in behalf of the defendant, the court, after further reflection, reconsidered its first decision, and granted the motion. The plaintiff's counsel asked leave to go to the jury on the question whether the plaintiff used proper care in looking, and on the question whether smoke was an obstruction to the view, which application was denied by the court, and the plaintiff duly excepted. This direction of a nonsuit and this exception bring up the sole question in the case.

The general question is therefore whether the plaintiff, by his evidence, has shown that he exercised proper care in leaving the locomotive of the

Buffalo, Rochester & Pittsburg Railroad, and attempting to cross the defendant's tracks. He testified as follows: "*Question.* As the engine approached Colvin street, what were you doing? *Answer.* I looked west, and then looked east. *Q.* What were you looking for? *A.* I was looking for the train. *Q.* How did you look? *A.* I looked toward the west, and then down. *Q.* What do you mean by 'down?' *A.* Towards the east. *Q.* Did you have your eyes open? *A.* Yes, sir. *Q.* Did you have your ears open? *A.* Yes, sir. *Q.* What did you have them open for? *A.* I was looking and watching for the train. *Q.* What did you see or hear? *A.* I did not see anything, and I didn't hear anything; it was too dark. * * * *Q.* After you looked out and saw nothing and heard nothing, what did you do? *A.* I stepped off. *Q.* Was the train at a stand-still—the engine—then? *A.* Yes, sir; it stood still. *Q.* Did you step on the ground? *A.* I stepped on the ground. *Q.* How many steps did you take? *A.* Two steps." Further than this the plaintiff had no recollection of the occurrence. In saying that he took two steps on the ground, the plaintiff manifestly intended to be counted—such was the proximity of the tracks—his last descending step from the cab. On cross-examination, he testified that the engine had stopped moving when he looked to the east and west, and then he got down at once. The plaintiff had in his hand a dinner-pail, and he was smoking a pipe at the time. He was required to take two steps in descending from the locomotive to the ground, which was a distance of 4 feet and 10 inches from the floor of the cab of the engine. The width of the gangway of the engine is 7 feet and 7 inches, and of the caboose-car, which it was drawing, 8 feet and 6 inches. The projection of the gangway over the track was 1 foot $5\frac{1}{4}$ inches. Assuming that the projection of the locomotive upon the defendant's track was as great as that of the engine on the Buffalo, Rochester & Pittsburg Railroad, there would be left a space of about 4 or $4\frac{1}{2}$ feet between the projections of these two locomotives, and a somewhat narrower space between the caboose on the Buffalo, Rochester & Pittsburg Railroad and the cars on the defendant's track.

The particular inquiry, therefore, is, (under the testimony of the plaintiff himself,) did he, at the moment when his senses were required to be put in active operation, use them for the purpose of self-preservation? Taking his own version of his actions, namely, that he looked both to the east and to the west while approaching Colvin street at about the instant of stopping, in its most favorable aspect, he still, it seems to us, lacked the exercise of the essential duty of a person situated as he was. When he made these observations he was not contemplating the immediate crossing of the defendant's tracks; he was moving parallel with them, and, as he knew, in close proximity thereto. There is no significance in the observations which he then made, so far as they relate to the instant of collision. It was no more than naturally would be done by a person who, in his circumstances, was to determine on which side of the locomotive he was to alight. To a prudent man it naturally would have occurred that to descend upon the side of the Central tracks was a dangerous, not to say a reckless, act. There was nothing to prevent his alighting on the south side of the locomotive, thus securing an ample view of the defendant's tracks before attempting to cross them, being the same on which the men in the caboose were discharged under the direction of the person who was at the time acting as conductor. The uncontradicted evidence is that the plaintiff descended from the cab of the locomotive backward. This, it is true, was the usual way of descending from the engine. It was his duty, as it seems to us, under the circumstances, if he elected to take the hazards of getting off the locomotive on that side, to take an observation of the defendant's tracks, and see whether he could safely pass across them. But this he did not do. There is no evidence whatever in the case showing any act of prudence or care for self-preservation on the part of the plaintiff after the locomotive on which he was riding had stopped, when he bade the

engineer and fireman good-night. He was well aware that trains on the defendant's tracks were accustomed to pass very frequently at that hour of the night. He knew the dangers of the situation, and it was his duty, under every rule governing the conduct of persons in crossing railroad tracks, if he was willing to take the hazards of descending upon the north side of the engine, to stop as he descended, and see if he was likely to be overtaken by a train upon the track which was so near to him. We are of the opinion, therefore, that the plaintiff failed to exercise the care which a prudent person, knowing the dangerous situation, should have exercised under the circumstances, and for this reason he cannot recover damages for his injuries. No attempt is made by his counsel to show, even by the slightest inference from the evidence, that the plaintiff did any act of looking or hearing after leaving the cab of the locomotive.

But the learned counsel for the plaintiff has labored in his elaborate argument to excuse his client's failure to see the approaching train, when he in fact did look just before, or at the time of, the stopping of the locomotive, first by claiming that smoke from this locomotive may have obscured the head-light of the approaching train. The plaintiff gave some evidence to the effect that at about the time of his leaving the locomotive the fireman threw coal into the furnace of the engine, and from this it is argued, not proved, that dense smoke escaped from the locomotive, and might have obscured the view taken by the plaintiff at that time. This hypothesis—for it is nothing more than an hypothesis—is attempted to be strengthened by the evidence of a government weather observer, who testified that on the evening in question the wind was from the north-east, having a velocity of about four miles an hour. The tracks of the defendant at Colvin street, it is shown, run, not due east and west, but rather slightly north-east to south-west. From this it is argued that the smoke which might have escaped from the locomotive probably obscured the view taken by the plaintiff. But upon cross-examination the government weather observer testified that the wind might have been a little north of east or south of east. The evidence of the witness in this respect does not seem to go very far to support the theory of the learned counsel. This witness further testified that the density of the atmosphere at this time was 86; that is, that it was surcharged with 86 per cent. of moisture, at a standard of 100. He also gives his observations of the effect of the atmosphere on smoke, as to raising or settling. Having stated that the evening was cloudless, and the stars and the heavens clearly visible, and the barometer normal, he says that the smoke coming out of the smoke-stack would not tend to rise, but rather would tend to fall, if anything, and that, the wind being light, it would drift slightly in the direction the wind was going. This opinion might be of more force had it been shown in what direction the wind in fact was going. But the plaintiff himself has, by his own testimony upon this subject, put at rest all speculation by experts. He says that he saw a switch-light between the Buffalo, Rochester & Pittsburg track and the adjacent track of the defendant's road at a point which is shown to be $338\frac{1}{2}$ feet west of Colvin street. At that distance, at least, he testified he was clearly able to see and to distinguish and know a switch-light and its particular location. The theory of an obstruction to the vision by smoke, therefore, we think is hardly supported by the evidence in the case. It is further argued by the counsel for the plaintiff that his client may have taken the head-light of the locomotive for a switch-light. This, too, is a mere speculation, as it seems to us, for, as already observed, the plaintiff testified to seeing a switch-light, locating it accurately; and it is shown that other switch-lights, like the one which he saw, were raised from the ground about three and one-half feet only, and without reflectors, while the head-light of a locomotive is upwards of ten feet from the ground, with reflectors that are unmistakable, particularly to a person of the long observation of the plaintiff in such matters. It is also argued

that the glare of the head-light of the engine on which the plaintiff was riding, or the flare of the open furnace door, might have blinded his eyes so that he was unable to see clearly. But we are unable.to find any evidence in the case to support this theory. In respect to the three grounds stated for extenuating, excusing, or justifying the plaintiff's failure to see the approaching train, it may be said that each of them rests on an hypothesis only, and not upon facts given in evidence upon which it would be safe to render a judgment. But assuming, on the other hand, that when the plaintiff did in fact look to the east and west, as he said he did, it was a timely act, and sufficient to enable him to cross the tracks under ordinary circumstances, in this particular case such observation was clearly insufficient and inadequate for his own protection. The courts, as it seems to us, are not bound by the bare assertion of a party that he used his natural faculties of seeing and hearing before attempting to cross the track, to submit his case to the jury, when it is manifestly untrue, or it is shown that the observation was not opportunely made. In the case of *Nash* v. *Railroad Co.*, 26 N. E. Rep. 266, (less fully reported in 125 N. Y. 715,) the plaintiff had given evidence, before entering upon the defendant's tracks at a private crossing, to the effect that a gate which was 79 feet away from the track was opened by his son; whereupon he drove on down through the lane on a walk until he reached level ground, 35 feet from the easterly track of the railroad, and then on a trot to and upon the track. He was crossing from the east to the west. His view of the track was obstructed until he got within 25 feet of it. By reference to the bound volume of the printed case in that action, to which our attention has been called by the learned counsel for the defendant, his evidence is found to be much more specific in respect to his efforts to discover the approach of danger, with a purpose to avoid receiving personal injury, than is that of the plaintiff in this action; and yet the court of appeals in that instance, reversing the judgment of the circuit and of the general term, held that the plaintiff was guilty of contributory negligence which would defeat his claim for damages. Under that authority, and under the peculiar facts appearing in this case, and in the absence of evidence to excuse the plaintiff from actually seeing the approach of danger, we are of the opinion that the nonsuit was correctly ordered. Plaintiff's motion for a new trial denied, with costs, and judgment ordered for the defendant on the nonsuit. All concur.